## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 15 2015, 8:08 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Michael R. Fisher
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

J. T. Whitehead
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Ricardo Minney,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

October 15, 2015

Court of Appeals Case No.
49A02-1503-CR-172

Appeal from the Marion
Superior Court

The Honorable Lisa F. Borges,
Judge

The Honorable Anne M.
Flannelly, Magistrate

Trial Court Cause No.
49G04-1406-FA-33132

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Defendant, Ricardo Minney (Minney), appeals his conviction and sentence for Counts I-II, child molesting, Class A felonies, Ind. Code § 35-42-4-3(a)(1) (2013); and Count IV, child molesting, a Class C felony, I.C. § 35-42-4-3(b) (2013).

We affirm.

## ISSUES

Minney raises two issues on appeal, which we restate as:

(1) Whether the trial court committed a fundamental error by admitting certain testimonies at trial; and

(2) Whether Minney's sentence is inappropriate in light of the nature of the offenses and his character.

## FACTS AND PROCEDURAL HISTORY[1]

T.P. (Father) and J.H. (Mother) are the biological parents of J.P., born on April 25, 2007.  In 2008, Father and Mother ended their relationship, and Mother

---

[1] In accordance with the revised Administrative Rule 9(G), certain evidence was submitted to our court which is declared confidential and must be excluded from public access.  Because a number of facts derived

became the custodial parent. Parenting time was set in accordance with the Indiana Parenting Time Guidelines. Thereafter, Father married L.P. and they had two children, a son and a daughter. J.P. would visit with Father and L.P. every other weekend, a day in the course of the week, and during school vacations. Sometime in 2010 or 2011, Mother began a romantic relationship with Minney, and shortly thereafter, the two moved in together. J.P. was fond of Minney and she referred to him as her "stepdad." (Transcript p. 31). During that time, Mother changed her work schedule where she worked from 1:00 a.m. to 9:00 a.m. For the times she was at work, Mother would leave J.P. under her parents' care or under Minney's supervision.

[5] On one occasion, while Mother was at work, J.P. was sitting on Minney's lap in the living room. Minney took off J.P.'s pants and underwear and then put his lips on J.P.'s "private part," which J.P. referred to as the "front" where "little girls use to pee." (Tr. p. 32). According to J.P., Minney moved his tongue around her private area and J.P. felt like Minney was "sucking on it." (Tr. p. 33). Another time, Minney put J.P.'s mouth on his "private part." (Tr. p. 36). According to J.P., Minney's private part was the area that "little boys

from the confidential records are "essential to the resolution of litigation[,]" we have included confidential information in this decision only to the extent necessary to resolve this appeal. Admin. R. 9(G)(7)(a)(ii)(c).

use to pee." (Tr. p. 37). J.P. also described Minney's penis as "brown and cylinder shape" which was "[h]ard." (Tr. p. 36). Both events occurred when J.P. was six years old. On another occasion, Minney was lying on the couch, with J.P. sitting close to his penis. According to J.P., Minney had his hands around her hips.

[6] Sometime after the above incidents, J.P. disclosed to Mother that Minney had touched her, but Mother failed to act on J.P.'s complaint. According to the probable cause affidavit, the above incidents made J.P. act out in a sexualized manner, such as kissing girls at school and asking them if they wanted to have sex with her. Also, while at Father's and L.P.'s house, J.P. touched her two-year-old half-sister's private parts. Troubled by J.P.'s aberrant behavior, on March 31, 2014, L.P. questioned J.P. if anyone had "done something" to her. (Tr. p. 42). Mentioning each name at a time, L.P provided Father's, Mother's, Minney's and her own. J.P. answered in the negative on all names, but she wavered on Minney's name. J.P. was afraid that she would get Minney into trouble. After further convincing, J.P. divulged to L.P. that Minney had touched her inappropriately. The disclosure left J.P. feeling worse, and she remained in the bedroom for a while. L.P. reported to Father that Minney had molested J.P.

[7] Acting on the allegations, Father summoned Mother and Mother's extended family for an emergency family meeting. The purpose of the meeting was to inquire about J.P.'s assertions, or if anyone had "seen any red flags or heard anything" that would allow Father to believe J.P.'s claims. (Tr. p. 61). The

meeting did not yield any results, but it was agreed that they would all keep an eye on J.P. After the meeting, Father went home where he picked up J.P. and took her to the hospital for an evaluation. The hospital contacted Department of Child Services (DCS). DCS Family Case Manager Michelle Tackette (FCM Tackette) arrived at the hospital and took a report. The report was then sent to DCS Forensic Interviewer, Laura Fuhrmann (Fuhrmann), who interviewed J.P. on April 3, 2014. During the fifteen-minute video recorded interview, J.P. disclosed to Fuhrmann that Minney had molested her. FCM Tackette was watching the interview in another room across the hallway. After the interview, DCS contacted Detective Nicolle Lynn (Detective Lynn) of the Indianapolis Metropolitan Police Department and provided her with J.P.'s report.

[8] On June 25, 2014, the State filed an Information, charging Minney with Count I, II, and III, child molesting, Class A felonies; and Count IV, child molesting, a Class C felony. A jury trial was held on February 19, 2015. The State sought to introduce Father's, Mother's, L.P.'s, and J.P.'s testimony, as well as Fuhrmann's interview of J.P. and Detective Lynn's testimony.

[9] During the trial, Fuhrmann stated that she is trained to interview children who have allegedly been sexually abused. Fuhrmann stated she used "Finding Words/Child First Protocol" methodologies to conduct the interview. (Tr. p. 118). She explained that the methods involve building a rapport with the child; making the child feel comfortable; talking about the child's family; and going over an anatomical diagram with body parts where the child points out what

parts are acceptable to touch and those that are not. Fuhrmann's observation of J.P. during the interview was that she "was very calm and able to communicate about what had happened. She felt comfortable in the room and was able to talk with me." (Tr. p. 122). Also, Fuhrmann stated that J.P.'s assertions of the molestation were "pretty consistent." (Tr. p. 124). Detective Lynn testified that her investigation involved viewing J.P.'s video recorded interview and also questioning FCM Tackette, Mother, Father, and J.P.'s extended family. Detective Lynn stated that formal charges do not always arise from an investigation; however, in this case, they did.

[10] At the close of the evidence, Minney moved for a directed verdict on Count III, arguing that there were only two potential acts of sexual deviate conduct which were covered in Counts I and II. After hearing arguments from both sides, the trial court granted Minney's motion and dismissed Count III. Subsequently, the jury found Minney guilty of Counts I, II, and IV. On March 2, 2015, the trial court held Minney's sentencing hearing where it merged Count IV into Count I, and then sentenced Minney to an executed sentence of thirty years each for both Class A felonies of child molesting in the Department of Correction (DOC). Minney's sentences were to run concurrently.

[11] Minney now appeals. Additional facts will be provided as necessary.

I. *Admission of Evidence*

[12] Minney first argues that it was fundamental error for the trial court to admit Fuhrmann's and Detective Lynn's testimonies into evidence. We initially observe that the decision to admit or exclude evidence is within a trial court's sound discretion and is afforded great deference on appeal. *Carpenter v. State*, 786 N.E.2d 696, 702 (Ind. 2003). An abuse of discretion occurs when the trial court's decision is clearly erroneous and against the logic and effect of the facts and circumstances before it or it misinterprets the law. *Id*. at 703. When reviewing the admissibility of evidence, we consider only the evidence in favor of the trial court's ruling and any unrefuted evidence in the defendant's favor. *Redding v. State*, 844 N.E.2d 1067, 1069 (Ind. Ct. App. 2006).

[13] Because Minney did not object to the admission of this evidence at trial, he has waived appellate review of this issue. *See Manuel v. State*, 793 N.E.2d 1215, 1218 (Ind. Ct. App. 2003), *trans. denied*. However, as noted above, Minney attempts to preserve the issue, claiming that the trial court committed fundamental error in admitting Fuhrmann's and Detective Lynn's testimonies into evidence.

[14] The fundamental error exception is very narrow, and it arises only when there are "clearly blatant violations of basic and elementary principles, and the harm or potential for harm could not be denied." *Warriner v. State*, 435 N.E.2d 562, 563 (Ind. 1982). To be fundamental error, the resulting error must deny the

defendant fundamental due process. *Id.* In determining whether the error in the introduction of evidence affected an appellant's substantial rights, we assess the probable impact of the evidence on the jury. *Manual*, 793 N.E.2d at 1219.

[15] Specifically, Minney argues that Fuhrmann's and Detective Lynn's testimonies added no new factual evidence but were only offered to "vouch" and "bolster" J.P.'s testimony. (Appellant's Br. p. 6). Put differently, Minney argues that their testimonies were the functional equivalent of telling the jury that J.P. was telling the truth.

[16] Vouching testimony is generally prohibited under Indiana Evidence Rule 704(b), which states: "Witnesses may not testify to opinions concerning intent, guilt, or innocence in a criminal case; the truth or falsity of allegations; whether a witness has testified truthfully; or legal conclusions." Such testimony is an invasion of the province of the jurors in determining what weight they should place upon a witness's testimony. *Bean v. State*, 15 N.E.3d 12, 18 (Ind. Ct. App. 2014), *trans. denied*; *Gutierrez v. State*, 961 N.E.2d 1030, 1034 (Ind. Ct. App. 2012). It is essential that the trier of fact determine the credibility of the witnesses and the weight of the evidence. *Gutierrez*, 961 N.E.2d at 1034.

[17] Minney cites to *Hoglund v. State*, 962 N.E.2d 1230, 1232 (Ind. 2012). In that case, our supreme court observed that "[f]or over two decades our courts have adhered to relaxed evidentiary rules concerning the testimony of children who are called upon as witnesses to describe sexual conduct." *Id.* In so doing, Indiana had been part of a minority of jurisdictions that allow "some form of

vouching of child witness testimony in child molestation cases." *Id*. at 1235. Disagreeing with the previous line of cases, the *Hoglund* court enunciated a new rule:

> [W]e expressly overrule that portion of *Lawrence* allowing for "some accrediting of the child witness in the form of opinions from parents, teachers, and others having adequate experience with the child, that the child was not prone to exaggerate or fantasize about sexual matters." [*Lawrence v. State*, 464 N.E.2d 923, 925 (Ind.1984)]. This indirect vouching testimony is little different than testimony that the child witness is telling the truth.

*Id*. at 1237. More broadly, the court disallowed testimony by any witness, whether lay or expert, that another witness—including a child witness—is or is not telling the truth. *Id*.

[18] In the instant case, during direct examination, the State questioned Fuhrmann as follows:

> Q. [] How long did your interview with J.P. take?
> A. It was approximately 15 minutes.
> Q. Okay. During that interview, did she make a disclosure to you with regard to sexual abuse involving [] Minney?
> A. Yes.
> Q. Okay. Did she at all sway back and forth in what she was telling you during that interview?
> A. No.
> Q. Okay. Would you say she was pretty consistent in that time that you talked to her?
> A. Yes.
> Q. Okay. And the technique that you previously described the rapport building, open-ended questions, and is that the technique that you used with her?

A. Yes.

Q. Okay. And who observed this interview?

A. The caseworker, Michelle Tackett.

Q. Okay. What's the purpose of that? Why have somebody observe?

A. My role in the interview is just to ask the questions and to gain the information. I have no other role in the case other than just to do that. Whereas, the caseworker, it's her job then to assess and make any determination of what the next steps will be. Also, when you have someone observing the interview, if there is something that I may have left out or something that I was unable to notice, she's able to notice that because two eyes are better than one.

Q. Got it. So you were just kind of collecting any information the child will give you?

A. Yes.

(Tr. pp. 124-25).

Viewing Fuhrmann's responses from the above excerpt, we do not believe that they carry a vouching force. Fuhrmann's role was to collect the information, and make no assessment regarding the case. The closest Fuhrmann came in her testimony to providing what Minney mischaracterizes as indirect vouching would be Fuhrmann's testimony that J.P.'s narration of Minney molesting her was *pretty consistent*. Even if we were to assume that this was improper vouching, we cannot agree that its admission resulted in fundamental error. At issue in this case was the credibility of J.P., who was thoroughly questioned on cross-examination and whose testimony did not waver from that given during direct-examination. The testimony of a sole child witness is sufficient to sustain a conviction of child molesting. *Stewart v. State*, 768 N.E.2d 433, 436 (Ind. 2002). In this regard, we conclude that Fuhrmann's response that J.P.'s testimony was consistent was not so prejudicial to Minney as to make a fair

trial impossible. Minney has not established error in the admission of Fuhrmann's testimony regarding "vouching," let alone fundamental error.

[19] With regards to Minney's claim that Detective Lynn also vouched for J.P.'s testimony, we note that during the State's case-in-chief, the following exchange took place between the State and Detective Lynn:

Q. You did watch the tape, right?
A. Yes, I did.
Q. And did you speak to anyone after that?
A. Yes.
Q. Who did you [] speak to[?] [F]amily members of J.P.?
A. Yes, I talked to the [DCS] worker. I also talked to [] [M]other, [F]ather, her stepmother, maternal grandmother, paternal grandmother, and her aunt.
Q. And eventually you screened the case, right?
A. That's correct.
Q. And what is screening a case?
A. Screening a case basically means that I gather all the information that I have about a case. So all of my interviews, any additional evidence that I might have, and kind of put into a bundle [] and give it to the prosecutor.
Q. And did you meet with the prosecutor to go over this case?
A. Yes, I did.
Q. Do [] formal charges result from every investigation []?
A. Absolutely not.
Q. And so formal charges were filed in this case, right?
A. Yes.

(Tr. pp. 140-41).

[20] Minney argues that Detective Lynn's "statement that charges do not result from every investigation but did from this one[,] implicitly informed the jury that the evidence in this case, which consisted solely of the testimony of J.P., was

worthy to [believe]." (Appellant's Br. p. 8). Again we disagree. The jury already knew that charges had been filed against Minney, otherwise there would be no trial. Moreover, given the context of Detective Lynn's questioning, she did not specifically comment on any of the things precluded by Rule 704(b). Detective Lynn's response was an answer to a general question in her role as an investigator; therefore, it cannot be said to be vouching. For the foregoing reasons, Minney's argument that Detective Lynn's testimony amounted to vouching also fails.

## II. *Inappropriate Sentence*

[21] In his last argument, Minney claims that his concurrent thirty-year sentences for the two Counts of child molesting is inappropriate in light of the nature of the offenses and his character. Indiana Appellate Rule 7(B) provides that we "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, [we find] that the sentence is inappropriate in light of the nature of the offense and the character of the offender." The burden is on the defendant to persuade the appellate court that his or her sentence is inappropriate. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006). "Ultimately the length of the aggregate sentence and how it is to be served are the issues that matter." *Cardwell v. State*, 895 N.E.2d 1219, 1224 (Ind. 2008). Whether we regard a sentence as appropriate at the end of the day turns on our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and a myriad of other considerations that come to light in a given case. *Id*.

[22]     The advisory sentence is the starting point the legislature has selected as an appropriate sentence for the crime committed. *Abbott v. State*, 961 N.E.2d 1016, 1019 (Ind. 2012). For his Class A felonies, Minney faced a sentencing range of twenty to fifty years, with the advisory sentence being thirty years. Ind. Code § 35-50-2-4. Here, the trial court imposed concurrent sentences of thirty years for each Count.

[23]     Turning to the nature of the offense, Minney argues that there was "no physical harm to [J.P.,] and there was no allegation or suggestions that threats were made." (Appellant's Br. p. 16). We find it offensive that Minney attempts to diminish the seriousness of his offenses by claiming that J.P. suffered no serious physical harm. Minney was Mother's live-in boyfriend, and J.P. felt kinship toward Minney as she regarded him as stepfather. While Mother was away at work, Minney used J.P. to satisfy his sexual needs at least three times. Additionally, the significant harm to J.P. as a result of these crimes makes Minney's offenses even more egregious. J.P. became increasingly sexual, in that, she started kissing girls at school, and she also fondled her little sister's private parts. It is obvious that J.P. will suffer emotional scars that come with losing her innocence at the hands of someone masquerading as her protector. For these reasons, we cannot say that Minney's sentence is inappropriate in light of the nature of the offenses.

[24]     With respect to Minney's character, he notes to us that he has one prior juvenile arrest. Minney further suggests that we take into account that he has no adult criminal history, he had graduated from college, he was gainfully employed,

and had otherwise lived a legally and morally commendable lifestyle. The fact that he molested J.P. belies his claim to have been living a largely law-abiding and moral life. Also, we find that even though Minney's criminal history is minor and that he was a productive member of society, he violated his position of trust with J.P., and that speaks volumes of his unsavory character. *See McCoy v. State*, 856 N.E.2d 1259, 1264 (Ind. Ct. App. 2006) (being in a position of trust aggravates the charge of child molesting and concerns the character of the offender). Here, Minney has failed to meet his burden in persuading us that his sentence is inappropriate in light of his character.

[25] After due consideration of the evidence before us, including the fact that a concurrent sentence was ordered in the instant case, we cannot say that Minney's thirty-year executed sentence is inappropriate in light of the nature of the offenses and his character.

## CONCLUSION

[26] Based on the foregoing, we conclude that (1) the trial court did not commit a fundamental error by admitting Fuhrmann's and Detective Lynn's testimonies; (2) Minney's sentence is not inappropriate in light of the nature of the offenses and his character.

[27] Affirmed.

[28] Brown, J. and Altice, J. concur